[No. B104618. Second Dist., Div. Three. Apr. 2, 1998.]

RAPHAEL NISSEL, Plaintiff and Appellant, v.
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, Defendant
and Respondent.

1104

## COUNSEL

Philip Kaufler for Plaintiff and Appellant.

Soltman & O'Meara, Steven B. Soltman and James S. Cooper for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—The plaintiff and appellant, Raphael Nissel, doing business as Raphy Diamonds (hereinafter, Nissel), appeals from a summary judgment entered in favor of the defendant and respondent, Certain Underwriters at

Lloyd's of London (hereinafter, Lloyd's).[1] Lloyd's had issued a jeweler's block policy to Nissel which included coverage for losses suffered as a result of theft but expressly excluded losses from an "unattended" vehicle. As we conclude that the record demonstrates that (1) there is no dispute that the loss for which Nissel sought recovery under the policy was one falling within that exclusion and (2) the exception to the exclusion relied upon by Nissel does not apply, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Prior to December 17, 1993, Nissel was engaged in the wholesale jewelry business in Los Angeles County and operated that business under the fictitious firm name and style of Raphy Diamonds. He sold loose and finished goods to retail jewelry stores. Nissel employed one Jeffrey Bolling as a traveling sales representative. Bolling would take jewelry merchandise on the road and visit various retailers in Southern California. He transported the jewelry in his own car and would show it to prospective retail customers.

On December 17, 1993, Bolling was in Hemet, California on a sales trip. He had with him over $300,000 in diamonds and other precious stones which either belonged to Nissel or other persons from whom Nissel had received the merchandise on consignment.[3] About 8:45 a.m. on that date, all of this merchandise was stolen from Bolling's *unattended* vehicle. According to the declaration of an eyewitness, one Alvin Cooper, two men approached an empty dark four-door car parked in front of the Denny's restaurant located at 1770 W. Florida Avenue, Hemet, California. Cooper was having breakfast with his wife at the time and he watched the two men open one of the rear doors to the vehicle and struggle to remove something from the backseat. Within a few minutes, they emerged from the vehicle with a large bulky dark-colored bag. They then entered another vehicle and drove away. Cooper then concluded that the two men probably did not own the dark car from which they had removed the bag and that a crime had taken place. He

---

[1]Lloyd's has been erroneously sued and named herein as the Subscribing Underwriters at Lloyd's.

[2]The relevant facts in this matter are undisputed and are demonstrated by either the allegations of Nissel's complaint, statements of fact asserted in his declaration or opening brief, or the uncontested *admissible* evidence presented by Lloyd's in support of its motion for summary judgment. Like the trial court, we ignore that portion of Lloyd's showing which constitutes inadmissible and unsworn hearsay.

[3]According to Nissel's declaration, filed in opposition to Lloyd's motion for summary judgment, Bolling had with him finished jewelry worth $139,937.58 and loose diamonds valued at $161,245. The total value of this merchandise was $301,182.58. Of this total, $129,990 represented the value of the merchandise which belonged to others and which were in Nissel's possession on consignment.

reported the incident to the manager of Denny's. Apparently, the police were called. A Hemet Police Department report described the occurrence of a claimed vehicle theft, about 8:45 on December 17, 1993, in front of the Denny's restaurant. A copy of that report was attached to Lloyd's papers in support of its motion. It reflects that witness statements were taken from both Bolling and Cooper.[4]

At the time of this loss, Nissel was covered by a jeweler's block policy issued by Lloyd's which insured "against all risks of loss or damage" to any precious stones, jewels or jewelry belonging to Nissel or others who may have, in the course of business, entrusted such merchandise to him. In short, there is no dispute that the jewelry merchandise which had been stolen was the type of property which the Lloyd's policy was intended to cover.

However, the policy also provided that it would cover damage or loss "arising from any cause EXCEPT:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[4] (i) Loss or damage to property while in or upon any automobile . . . unless, at the time the loss or damage occurs, there is actually in or upon such vehicle, the Assured [i.e., Nissel], or a permanent employee of the Assured, or a person whose sole duty it is to attend the vehicle. This exclusion shall not apply to property in the custody of a carrier mentioned in Section 3 of the SCHEDULE or in the custody of the Post Office department as first class registered mail."[5]

The relevant portion of the "SCHEDULE" (§ 3(c)) provides:

---

[4]As already noted in footnote 2, *ante*, we do not consider the contents of those statements as they amount to inadmissible hearsay. However, we do take note of the *fact* of the police report, the time and date it was made, the nature of the crime investigated and the names of the witnesses interviewed. These are all matters which would properly be admissible under the official records exception to the hearsay rule (see Evid. Code, § 1280) and they permit us to draw the reasonable inference that the event observed by Cooper in fact took place on December 17, 1993, and involved a claimed theft from Bolling's vehicle. These are two facts not included in Cooper's declaration as he made mention of neither the exact date nor a specific identifying description of the vehicle from which the dark-colored bag was taken.

[5]This is the "unattended" vehicle exclusion relied upon by Lloyd's. The last sentence sets forth the exception to the exclusion on which Nissel relies. The proper construction and application of this paragraph 4(i) is what this case is really all about.

"3. Limitations of Liability in respect of Property insured under item 2(a).[6] The maximum liability of the underwriters resulting from any one loss, disaster or casualty is limited to the following amounts in respect of:

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) Shipments in transit by customer parcel delivery service and the parcel transportation service of railroads, waterborne or air carriers and passenger bus lines (subject to the stipulations of Exclusion (e) of Condition 4) . . . . . . . . . . . No Liability."

Exclusion (e) of condition 4 provides, in relevant part:

"Loss or damage [will be excluded when] occurring in course of transit to shipments by:

"(1) Mail unless registered first class;

"(2) Railroad, waterborne or air carriers unless under receipt of their passenger parcel transportation or baggage services; . . . .

"(3) Motor carriers or truckmen other than under receipt of

"(a) those operating exclusively as a customer parcel delivery service (including air thereof in accordance with its tariff);

"(b) the parcel transportation of baggage services of passenger bus lines."

In January of 1994, Nissel made a claim under his policy with Lloyd's. After an investigation of the facts and circumstances of the loss, which included the taking of a recorded statement from Bolling on February 1, 1994, a review of the Hemet Police Department report of December 17, 1993, and an interview with Alvin Cooper, Lloyd's denied the claim. It did so on the ground that the exclusion in condition 4(i) of the policy applied since the theft occurred from an unattended vehicle and the "custody of a *carrier*" exception to the exclusion did not apply.[7]

On January 30, 1995, Nissel filed this action against Lloyd's. After certain law and motion proceedings, Nissel filed a first amended complaint on May

---

[6]Item 2(a) provides that:
"2. The sums Insured are (subject to the Limitations and conditions contained in the wording).
"(a) on Stock (and other people's goods) . . . . . . . $350,000."
[7]In a letter to the adjuster hired by Lloyd's, dated March 30, 1994, Nissel's counsel seems to concede the basic factual circumstances on which Lloyd's based its denial of Nissel's

5, 1995. In this pleading, he alleged four causes of action: (1) breach of the implied covenant of good faith, (2) common law fraud, (3) negligent misrepresentation and (4) breach of contract. Lloyd's filed an answer which, inter alia, alleged the affirmative defense that there was no coverage under the policy due to the application of the "unattended" vehicle exclusion.

On February 7, 1996, Lloyd's filed a motion for summary judgment. The motion was heard on March 11, 1996, at which time the trial court determined that there was no material dispute as to the facts recited above and that, as a matter of law and policy construction, the term "carrier" as used in the exception to the unattended vehicle exclusion did not apply. Based on those conclusions, the court granted Lloyd's motion and entered judgment in its favor. Nissel filed this timely appeal.

## ISSUES PRESENTED

The sole issue presented on appeal is whether the unattended vehicle exclusion applied to preclude coverage for Nissel's theft loss claim. The correctness of the trial court's conclusion on this question depends on whether (1) there was any unresolved or disputed issue of fact as to the "unattended" condition of Bolling's vehicle at the time of the theft, (2) the "carrier" exception can be applied to Bolling and (3) the policy provides liability coverage which is not subject to the aforesaid exclusion. Nissel would have us conclude that each of these questions should be answered in the affirmative. However, we agree with Lloyd's that the proper answer to each is "no."[8]

## DISCUSSION

### 1. *Standard of Review*

Summary judgment is granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.

---

claim. In that letter Nissel's counsel stated: "The facts surrounding this loss are not in dispute. The loss occurred when a salesman for Nissel was traveling with jewelry owned by Nissel and others in the trade, and *while the salesman left his car for a short period of time* his car was burglarized. All of the jewelry was stolen. The goods which total several hundred thousand dollars have not be recovered." (Italics added.) This letter and its contents would clearly appear to constitute an admission authorized by Nissel within the meaning of Evidence Code section 1222, and therefore not excludable as inadmissible hearsay.

[8]Nissel appears to agree that the resolution of these questions will resolve this appeal. He makes no separate argument relating to his intentional and negligent misrepresentation claims and thus, to the extent that Nissel may argue that their viability does not rest on the existence of coverage under the policy, we deem the argument waived. (*Barnes* v. *Litton Systems, Inc.* (1994) 28 Cal.App.4th 681, 685, fn. 4 [33 Cal.Rptr.2d 562].) Our determination that there is no coverage under the policy disposes of the entire case.

(Code Civ. Proc., § 437c, subd. (c); *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) The moving party bears the burden of establishing, by declarations and evidence, a complete defense to plaintiff's action or the absence of an essential element of plaintiff's case. (*Bacon* v. *Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858 [62 Cal.Rptr.2d 16]; *Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726-1727 [22 Cal.Rptr.2d 781]; Code Civ. Proc., § 437c, subd. (o).) The moving party must demonstrate that under no hypothesis is there a material factual issue requiring a trial. (*Flowmaster, Inc.* v. *Superior Court* (1993) 16 Cal.App.4th 1019, 1026 [20 Cal.Rptr.2d 666], clarified in *Romero* v. *American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199, 1202-1203 [45 Cal.Rptr.2d 421].)

When the moving party makes that showing, the burden of proof shifts to the opposing party to show, by responsive separate statement and admissible evidence, that triable issues of fact exist. (*Lorenzen-Hughes* v. *MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684, 1688 [30 Cal.Rptr.2d 210]; Code Civ. Proc., § 437c, subd. (o).) " '[An] issue of fact becomes one of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion. [Citation.]' [Citation.]" (*Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1450 [16 Cal.Rptr.2d 320].) ■ The interpretation of·a policy of insurance, which is the principal task presented to us by this appeal, is a question of law which we resolve de novo. (*Waller* v. *Truck Ins. Exchange* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

## 2. *Relevant Principles of Insurance Policy Construction*

In *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253], the Supreme Court set forth the basic rules which must guide our interpretation of any policy of insurance. Those rules are based upon statutes dealing with the interpretation of contracts generally. (*Id.* at p. 822.) The mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (Civ. Code, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (Civ. Code, § 1644) will control judicial interpretation. (Civ. Code, § 1638.) Thus, if the meaning

a layperson would ascribe to contract language is not ambiguous, then that meaning should be applied. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 822.) If an ambiguity still remains after applying these rules, then it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee (i.e., the insured) understood them at the time of formation. (Civ. Code, § 1649.) If the application of that rule does not resolve the ambiguity, then the ambiguous language is to be construed against the party who caused the uncertainty to exist. (Civ. Code, § 1654.) Ordinarily, this party would be the insurer.

The Supreme Court amplified on these principles two years later in its decision in *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545]. There, the court noted that "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. . . . The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . If contractual language is clear and explicit, it governs. . . . On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' . . . This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, *'the objectively reasonable expectations of the insured.'* . . . Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. . . . [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. . . . This is because *'language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.'* " (*Id.* at pp. 1264-1265, italics in original, citations omitted.)

Thus, the *Bank of the West* court made it clear that it was no longer enough to find an abstract ambiguity or a meaning for a disputed word or phrase which was simply "semantically permissible." In order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations.* (*Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) In order to do this, the disputed policy language must be examined *in context* with regard to its

intended function in the policy. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.) This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and "common sense." (*Id.* at p. 1276.) It probably does not matter whether this examination is made in connection with the first step of the *AIU* analytical approach or the second. (*Cooper Companies* v. *Transcontinental Ins. Co., supra,* 31 Cal.App.4th at p. 1106.) The objectively reasonable expectations of the insured and the analysis required to determine those expectations, may be relevant to both questions: (1) whether the disputed policy language, *in context,* is free from ambiguity and has a plain and clear meaning to a layperson and (2) in what sense did the insurer believe the insured understand that policy language at the time the policy was issued? The important point is, however, that a claimed ambiguity in the policy can no longer be resolved without a determination of the insured's objectively reasonable expectations. (*Ibid.*; *ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1785 [22 Cal.Rptr.2d 206].)

### 3. *The Clear and Plain Meaning of the Language Used in the Exclusion, When Read in Context, Compels the Conclusion That Coverage Is Precluded*

■ The wording of the exclusion which is at the heart of this appeal very clearly describes a circumstance when there will be no coverage. It plainly states that no loss or damage to property will be covered while such property is in an automobile unless, "*at the time the loss or damage occurs,*" the insured or his permanent employee is "in or upon" the automobile. Nissel makes no claim that *this portion* of the exclusion is in any way unclear or ambiguous.

What Nissel argues is that the *exception* to the exclusion is ambiguous. The exception provides that the exclusion will not apply to property lost or damaged which was in the custody of a "carrier." Nissel argues that this term is undefined and could be applied to Bolling who was, at the time of the theft, "carrying" Nissel's merchandise from place to place in the normal course of his sales activities. Thus, the existence of such lack of clarity creates an ambiguity which should be resolved in his favor. There are two compelling reasons why we disagree.

First, Nissel ignores the mandate of current California law which requires the disputed language to be read in the *context* of the entire policy, as well as the circumstances of the case. Here, the exception to the exclusion is only to be applied to property lost or damaged while in the custody of a "carrier

mentioned in Section 3 of the Schedule . . . ." That reference very specifically describes carriers involved in *"customer parcel delivery service"* and to the parcel transportation services of *"railroads, waterborne or air carriers and passenger bus lines."*[9] (Italics added.) The cross-reference to other provisions in the policy (i.e., exclusion (e) of condition 4) further confirms that the policy's reference to "carriers" is directed at commercial and publicly regulated common carriers engaged in the business of transporting and delivering goods and merchandise. When read in the *context* of the entire policy, a layperson could only read the term "carrier" to mean a commercial or common carrier engaged in that business.

Second, the *objectively* reasonable expectations of an insured could not embrace any broader definition of the word. For us to accept Nissel's argument that a reasonable interpretation of the word "carrier" would allow it to be applied to Bolling, because he moved from place to place with the jewelry in his car, would effectively nullify the exclusion provided for in the policy. There would be little purpose to an "unattended vehicle" exclusion if excepted therefrom was every circumstance where any vehicle was used to transport covered merchandise. It is impossible for us to believe that such a result could have been intended by the parties or that any such expectation by Nissel would be *objectively* reasonable.

Nissel relies on a single case from Pennsylvania where the court construed the word "carrier" to apply to a traveling salesman. (*Rothstein* v. *Aetna Insurance Company* (1970) 216 Pa.Super. 418 [268 A.2d 233]). We reject that case and note that it apparently stands alone among decisions in this country with respect to this issue. All other cases which have applied this exclusion have had no trouble doing so where the loss arose from a theft from an unoccupied vehicle. Each of these cases has recognized that this standard policy exclusion requires that for coverage to exist for a theft from a private vehicle, it must be occupied or attended at the time of the theft. (See, e.g., *Centennial Insurance Company* v. *Schneider* (9th Cir. 1957) 247 F.2d 491, 494-495; *Jerome I. Silverman, Inc.* v. *Lloyd's Underwriters* (S.D.N.Y. 1976) 422 F.Supp. 89, 90; *Seelig* v. *St. Paul Fire & Marine Ins.*

---

[9]Nissel, at oral argument, noted that this language comes from a portion of the Schedule which indicated that there was "No Liability" and, therefore, should not be considered. However, all this reference means to us is that Nissel simply did not purchase any coverage for losses which he might sustain as the result of the theft or destruction of merchandise while in the "custody of a carrier." Contrary to Nissel's apparent argument, the fact that he did not purchase such coverage does not mean that we can or should ignore the language contained in the Schedule referring to certain described carriers. That language is nonetheless a part of the entire policy and was expressly and specifically incorporated into and defined the exception to the exclusion set out in condition 4(i).

*Co.* (E.D.N.Y. 1953) 109 F.Supp. 277, 279; *Bliss Ring Company, Inc.* v. *Globe and Rutgers Fire Ins. Co.* (1955) 7 Ill.App.2d 523 [129 N.E.2d 784, 788-789].)

We therefore conclude that the only reasonable construction of the word "carrier," *when read in context*, is to customer parcel delivery service companies or the parcel transportation services of common carriers such as railroads, waterborne or air carriers or passenger bus lines. The word "carrier" thus cannot be applied to Bolling and his sales activities involving traveling from customer to customer to display, promote and sell Nissel's merchandise. Thus, Nissel may not rely upon the exception to the exclusion.

4. *There Is No Remaining Issue of Material Fact as to the Application of the "Unattended Vehicle" Exclusion*

We are satisfied that the trial court's reasoning was sound. Ignoring the hearsay-laden statements in Bolling's unsworn recorded statement and in the Hemet Police Department's report, the trial court concluded that Alvin Cooper's declaration was sufficient to establish that the theft took place while Bolling's vehicle was unattended.[10] Cooper was an eyewitness. He watched the thieves take a bag from the dark *unoccupied* vehicle. Given the other undisputed circumstances, we can reasonably infer that that vehicle belonged to Bolling. There is no evidence whatever to contradict this conclusion.[11] Nissel's declaration does not dispute it, since he had no first-hand knowledge; nor does he even suggest the existence of any evidence, admissible or inadmissible which would support a contrary conclusion. (See, e.g., *Centennial Insurance Company* v. *Schneider, supra,* 247 F.2d at pp. 493-495 [where the court simply assumed the application of this exclusion-ary language to a theft from an unoccupied vehicle].)

Therefore, we conclude that the undisputed evidence does in fact demon-strate that the theft of Nissel's merchandise occurred from an empty or unoccupied vehicle and the exclusion in condition 4(i) of the policy applies to preclude coverage.

5. *That the Policy Also Might Provide Coverage for Nissel's Liability to Others Does Not Limit Application of the Exclusion*

Nissel argues that the policy also provided liability coverage which covered him for losses sustained by others and for which he could be held

---

[10]As we pointed out in footnote 7, *ante,* Nissel's own counsel conceded this point in writing.

[11]Cooper was also the *only* eyewitness submitting a declaration in the summary judgment proceedings. By the time that Lloyd's motion was filed, Bolling had disappeared. Neither Nissel nor Lloyd's has been able to locate him or to procure him as a witness.

liable.[12] He contends that this is additional coverage which will apply irrespective of the success of Lloyd's argument regarding the exclusion discussed above. However, we do not read this "Property of Others Clause" as providing a separate or additional coverage which is *not* subject to the exclusions set out in condition 4. Under the "Property Insured" portion of the policy, there is a provision which addresses coverage of consigned property. In section 2, the policy states that the "Property insured is

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) Property as above described, delivered or entrusted to the Assured by others who are dealers in such property or otherwise engaged in the jewelry trade, *but only to the extent of the Assured's own actual interest therein because of money actually advanced thereon, or legal liability for loss or damage thereto*." (Italics added.)

The exclusions in condition 4 (including the one here at issue in subsection (i)) expressly apply to such insured property of others and by its terms applies to all of the "property insured" as defined in section 2, including that quoted above from subsection (c). Thus, the "property of others" is expressly included in the insured property which is subject to condition 4 containing the list of exclusions, including the one which we have found applicable here. The "all risk" coverage commitment of the policy to any loss or damage *"arising from any cause"* is expressly subject to those exclusions. There is nothing in condition 6 regarding loss or damage to the property of others which changes that. It merely provides that the total potential liability of Lloyd's under the policy may include loss to the property of others in the possession of Nissel as measured either by Nissel's interest therein or his liability to others for such loss. It is clear, however, that nothing in condition 6 will increase the liability of Lloyd's under the policy.

Nothing in the single case cited by Nissel (which was decided under the substantive law of Florida) compels a contrary conclusion. (See *Golden Door Jewelry* v. *Lloyds Underwriters* (11th Cir. 1993) 8 F.3d 760, 766-768 ).

---

[12]Nissel relies upon condition 6 in the policy, entitled "Property of Others Clause" which provides: "In case of loss of or damage to property of others held by the Assured, for which claim is made upon the Underwriters, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Underwriters and the receipt by such owner or owners of payment in satisfaction thereof shall be in full satisfaction of any claim of the Assured for which such payment has been made. If legal proceedings be taken to enforce a claim against the Assured as respects any such loss or damage, the Underwriters reserve the right, at their option, without expense to the Assured, to conduct and control the defense on behalf of and in the name of the Assured. No action of the Underwriters in such regard shall increase the liability of the Underwriters under this Policy, nor increase the limits of liability specified in Section 3 of the SCHEDULE."

## DISPOSITION

The judgment is affirmed. Lloyd's shall recover its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.